HYLAND HILL NORTH CONDO-
MINIUM ASSOCIATION,
INC., Respondent,

and

St. Paul Fire and Marine Insurance
Company, Intervenor,

v.

HYLAND HILL CO., et al.,
petitioners, Appellants.

Nos. C7-94-2564, C8-94-2573.

Supreme Court of Minnesota.

June 6, 1996.

Rehearing Denied July 17, 1996.

Einar E. Hanson, Strobel & Hanson, P.A., Red Wing, for Appellants.

John R. Dorgan, Fredrick R. Krietzman, Frommelt & Eide, Ltd., Minneapolis, for Respondent.

## OPINION

TOMLJANOVICH, Justice.

This case involves claims of defective workmanship in the construction of Hyland Hill North Condominium (the Condominium). The respondent Hyland Hill North Condominium Association (the Association) originally sued seven defendants. After a number of defendants were dismissed and others added, only six defendants remain as appellants in this case. These parties are Hyland Hill Co., Gittleman Corp., Diversified Management Co., Gittleman Management Corp., Melvin C. Gittleman, and Donald W. Anderson (collectively, the "Developer").[1] The Association claimed the Developer was negligent; breached fiduciary duties; breached implied warranties under Minn. Stat. § 515A.4–111 (1992), the Uniform Condominium Act (UCA), and Minn.Stat. § 327A.02, subd. 1 (1992); and breached express warranties under the UCA. Though the Association also originally named Berwald Roofing (Berwald) as a defendant, the claims were later dismissed. However, the Developer filed a crossclaim against Berwald; thus, it remains a party.

In an order denying partial summary judgment dated June 29, 1993, the Hennepin County District Court found that the Association's claims, except for breach of fiduciary duties, were barred by the two-year statute of limitations, Minn.Stat. § 541.051 (1992). The court also found, however, that a fact issue existed as to whether the statute had

---

1. St. Paul Fire and Marine Insurance Company (St. Paul) was the insurance carrier for one of the unit owners in the Condominium. St. Paul paid the claim of $10,000 to that unit owner for repair of water damage. On September 18, 1992, St. Paul intervened for subrogation against the responsible defendant. Subsequently, however, St. Paul was dismissed from the case. In an amended complaint, The James Michael Seed Trust and The John Charles Seed Trust (the Trusts) were named as additional defendants.

They, too, were subsequently dismissed from the case.

The Association moved, in the court of appeals, to amend the caption of the case to reflect the fact that none of these parties were involved in the case any longer. However, because St. Paul and the Trusts were part of the caption when judgment was entered in district court, the court of appeals held that they were properly included in the caption.

been tolled or should be disregarded on grounds of estoppel.

A jury trial was held May 4 through May 17, 1994. The jury entered a special verdict finding no grounds for tolling the statute of limitations, or for estoppel. This verdict served to bar all the Association's claims except those for breach of fiduciary duties. Judgment was entered on the latter claims in the amount of $20,010.64. The crossclaim against Berwald was also found to be barred by the statute of limitations.

Both the Association and the Developer appealed and the court of appeals consolidated the separate appeals. The court affirmed the district court in part and reversed in part. *See Hyland Hill North Condominium Assoc. v. Hyland Hill Co.*, 538 N.W.2d 479 (Minn.App.1995). Both sides petitioned for review to this court. By order dated November 30, 1995, we granted review of the Developer's petition and denied the Association's petition.

Hyland Hill North is a condominium building in Bloomington, Minnesota. It was constructed in 1983 and 1984. The building was substantially completed by September 1984 and a certificate of occupancy was issued. The Condominium has three separate wings, each wing having three floors, all covered by the "main roof." There is also a separate roof covering a "party room" and pool area. The building's first residents, Marilyn and Robert Moore, signed a purchase agreement in February 1984, and moved into their unit in September 1984. The Condominium's declaration was filed in January 1985. Though the unit owners of the Condominium did not initially have control of the condominium association, they assumed control in May 1987.

Upon moving in, the Moores discovered leakage in their unit. In deposition testimony, Mrs. Moore stated that there had been water damage "since the first rain when we moved in." Thereafter, the unit "always had leaks." A second resident who moved in in 1985 recalled leakage since "the early time I was living there." At trial there was

testimony that in May 1987, the Board of Directors of the Association was aware of skylight leakage on the third floor of the Condominium. Minutes of a special meeting of the Association's members show that on October 6, 1987, the Association was aware of leaks in the party room and garage.[2] In an order denying partial summary judgment, dated June 29, 1993, the district court found that for purposes of the running of the two-year statute of limitations under section 541.051, the Association was aware of its leakage problems on or before October 6, 1987.

However, Joseph Kuzniar, who had been a member of the Board of Directors of the Association (the Board) since 1987, testified that until September 1989, the Association was only aware of leaks over the party room and skylight leaks. Kuzniar testified that in 1989, there was a "deluge where the water came from the third floor unit down into the second floor unit and came out the electrical outlets and so on." He stated that this was the first time the Association was aware of a "serious leak" in the roof. There was additional testimony that in March 1990, it was discovered there were approximately 80 leaks in third floor units.

After the "deluge" of leaks developed in 1989, the Association hired a roofing inspection firm called Inspec to assess the condition of the roof. Inspec examined the roof in October 1989. The Association received Inspec's report in December. Though Inspec found the overall appearance of the roof to be "fair" for its age, it urged the Association to undertake immediate repairs.

The following spring, Inspec performed an infrared scan of the building's roof. The test showed that some 10 percent to 15 percent of the roof's insulation was wet. Inspec then changed its earlier position that repair of the roof would be sufficient, and recommended that the roof be replaced. An Inspec representative gave the Association a "worst case" estimate of $200,000 to replace the roof. At an Association meeting on May 8, 1990,

---

**2.** There was trial testimony that the leaks in the party room were due to wall problems, not roof problems. Further, as noted above, the roof over the party room and pool was separate from the main roof over the units.

based on the $200,000 estimate, the members approved a special assessment to replace the roof.[3] During the summer of 1990, the old roof was torn off and a new one installed.

The Association also experienced "nonroof" difficulties with the Condominium building. There was testimony that during and after 1991, leakage occurred in the windows of three-season porches in the Condominium. There was also testimony that in October 1992, wood beams around sundecks at the Condominium were found to be rotted. Repairs were made to both the three-season porch windows and the rotted wood beams. There was also expert testimony that the building did not have appropriate expansion joints, which allow the brick facade to "freely breathe," and that brick was cracking off the building.

The Association filed this action in November 1990, asserting claims for negligence, breach of warranties, and breach of fiduciary duties. The Association brought a motion for summary judgment. The district court denied the motion, but in an order dated June 19, 1993, found: the Association's claims (except the claim for breach of fiduciary duties) were governed by the two-year statute of limitations in section 541.051; the Association discovered its injury by October 6, 1987; and factual issues existed as to whether the two-year period was tolled by assurances from the Developer, and whether the Developer should be estopped to raise the statute of limitations.

The case was tried before a jury in May and June 1994. By special verdict, the jury found: Berwald and the Developer were negligent; the Developer breached implied and express warranties to the Association under the UCA; and the Developer breached other implied warranties under Minn.Stat. § 327A.02 (1992). Negligence was apportioned among all defendants. The jury awarded separate damages for roof and nonroof related defects. The jury also awarded separate damages for negligence, breach of UCA warranties, breach of non-UCA warranties, and breach of fiduciary duties. Finally, the Developer was found to have made no "promises, inducements, representations or concealments" concerning defects in the building. Thus, there were no grounds for estoppel or tolling of the statute of limitations.

Because the jury found no estoppel or tolling, pursuant to the district court's order of June 29, 1993, the Association was barred from collecting any damages for negligence or for breach of warranties. For the same reason, the Developer was also barred from collecting damages from Berwald. The only damages awarded by the district court were for the Association's claims of breach of fiduciary duty. Upon these claims, the Association was awarded $20,010.64.

The court of appeals affirmed the district court in part and reversed in part. *Hyland Hill*, 538 N.W.2d at 481. It held that the six-year statute of limitations in section 515A.4–114 applied to the breach of warranty claims under the UCA and that the statute of limitations did not begin to run until the declaration for the Condominium was filed. *Id.* at 483. Because the declaration was filed less than six years prior to the filing of suit, the Association's claims of breach of warranty under the UCA were not barred. *Id.* The court of appeals also held that even if the two-year statute of limitations in section 541.051 applied, the Association's claims for roof defects would not be barred because such actions did not accrue until the Association discovered that the roof needed replacement when Inspec reported to them in May 1990. *Id.* at 484. That is, the court held that the Association's knowledge of claims for repair did not trigger the statute of limitations for a claim of replacement. The Developer appeals the decision of the court of appeals.

The Developer first points out that the two-year statute of limitations under section 541.051 applies to the Association's defective construction claims that do not arise under the UCA. These claims involve negligence and breach of non-UCA warranties. While it is not disputed that the two-year statute of limitations applies to these claims, the date the statute of limitations began to run is disputed.

---

3. Later, however, the low bid came in at approximately $350,000.

The jury awarded damages for both roof and nonroof defects. We first address the date the two-year statute of limitations began to run for roof-related defects.

Section 541.051, subd. 1 provides:

(a) Except where fraud is involved, no action by any person in contract, tort, or otherwise to recover damages for any injury to property, real or personal, * * * arising out of the defective and unsafe condition of an improvement to real property, * * * shall be brought against any person performing or furnishing the design, planning, supervision, materials, or observation of construction of the improvement to real property or against the owner of the real property more than two years after discovery of the injury * * *.

    *     *     *     *     *     *

(b) For purposes of paragraph (a), a cause of action accrues upon discovery of the injury * * *.

It is clear that under this section the statute of limitations began running upon the Association's discovery of defects in the Condominium's roof.

In an order denying summary judgment dated June 29, 1993, the district court found that "the Association was aware of the problems with the roof no later than October 6, 1987, as evidenced in the minutes of a Special Meeting called by the Association and held on October 6, 1987." The minutes of this special meeting reveal that there was discussion of water leaks in the garage and party room. In an order dated March 22, 1994, the district court declined to reconsider its order of June 29, 1993. When judgment was finally entered on August 2, 1994, the district court found that the two-year statute of limitations under section 541.051 began running on or about October 6, 1987. The Association argues, however, that it was not aware of its injury until the "deluge" of leaks occurred in the fall of 1989. Also, the court of appeals held that while the Association may have been aware of the need for repair of the roof on or before October 6, 1987, it was not aware of the need to replace the roof until Inspec informed the Association in May 1990 that such action would be necessary.

The district court's findings of fact "shall not be set aside unless clearly erroneous * * *." Minn.R.Civ.Proc. 52.01. There was both trial and deposition testimony that leakage was occurring in the Condominium as early as 1985. The meeting minutes referred to in the district court's order of June 29, 1993, clearly demonstrate that the Association was aware of leakage as early as October 6, 1987. Further, section 541.051 provides that "a cause of action accrues upon discovery of the injury." We view repair and replacement of a roof as different remedies for the same injury, namely, defective construction. Thus, we find that the district court was not clearly erroneous in finding that the Association was aware of its injury by October 6, 1987, and that this was the date the two-year statute of limitations under section 541.051 began to run for roof-related defects. Therefore, we hold that the Association's claims for roof defects involving negligence and breach of non-UCA warranties are barred by the two-year statute of limitations in section 541.051. The court of appeals, however, distinguished between roof defects and defects in masonry facade, three season patios, and sundecks. It labeled the latter defects "nonroof" defects. The court then held that the district court "abused its discretion in failing to make [a] distinction [between roof and nonroof defects] for purposes of establishing a discovery date." *Hyland Hill,* 538 N.W.2d at 485.

We disagree. To draw a line between roof, masonry, patio or sundeck defects strikes us as arbitrary. The Association has cited no law, nor are we aware of any, which would require the district court to distinguish between these different types of construction defects. While it would not have been unreasonable to distinguish between the different types of defects involved in this case, we do not think that the district court abused its discretion in not doing so. Thus, for purposes of establishing a discovery date, we hold that the district court did not abuse its discretion in not distinguishing between roof and nonroof defects.

Having so held, we now conclude that the trial court was correct in establishing October 6, 1987, as the date upon which the two-

year statute of limitations under section 541.051 began to run. This statute of limitations applies to the Association's claims involving negligence and breach of non-UCA warranties. The Association did not file suit until November 1990. Thus, we hold that the Association's roof and nonroof defect claims involving negligence and breach of non-UCA warranties are barred by the two-year statute of limitations in section 541.051.

The Developer next argues that section 541.051 also applies to the Association's breach of warranty claims under the UCA. However, the Association maintains, and the court of appeals held, that the six-year statute of limitations under section 515A.4–114 applies to the Association's claims of breach of warranty under the UCA. We agree with the Association and the court of appeals. Section 515A.4–114 states:

(a) A judicial proceeding for breach of any obligation arising under section 515A.4–111 or 515A.4–112 must be commenced within six years after the cause of action accrues * * *.

(b) Subject to subsection (c), a cause of action under section 515A.4–111 or 515A.4–112, regardless of the purchaser's lack of knowledge of the breach, accrues:

\* \* \* \* \* \*

(2) as to each common element, the later of (i) the time the common element is completed (ii) the time the first unit in the condominium is conveyed to a bona fide purchaser * * *.

(c) If a warranty under section 515A.4–111 or 515A.4–112 explicitly extends to future performance or duration of any improvement or component of the condominium, the cause of action accrues at the time the breach is discovered or at the end of the period for which the warranty explicitly extends, whichever is earlier.

*Id.* Under Minn.Stat. § 645.26, subd. 1 (1994), if two statutory provisions conflict, then the more specific controls over the more general. *Id.* The Developer contends that section 541.051 conflicts with section 515A.4–114 with regard to warranties under the UCA. The Developer then argues that because section 541.051 is more specific than section 515A.4–114, it should control.

We, however, fail to see the conflict between the two sections and, thus, find no reason to engage in statutory construction. In *Greenbrier Village Condominium Two v. Keller Inv. Inc.,* 409 N.W.2d 519 (Minn.App. 1987), the court of appeals applied section 541.051 to breach of warranty claims involving construction defects in a condominium. However, it was not clear in that case that there was a claim that section 515A.4–114 applied or even that the warranties claimed to have been breached were those found in the UCA. Further, this court has never held section 541.051 applicable to claims involving breach of UCA warranties. Finally, section 515A.4–114 clearly states that "[a] judicial proceeding for breach of any obligation arising under section 515A.4–111 or 515A.4–112 must be commenced within six years after the cause of action accrues * * *." Thus, while we find that section 541.051 applies to the Association's claims involving negligence and breach of non-UCA warranties, we find no conflict in applying the six-year statute of limitations under section 515A.4–114 to the claims involving breach of warranties under sections 515A.4–111 and 515A.4–112.

Having decided that the six-year statute of limitations under section 515A.4–114 applies to the Association's claims involving breach of UCA warranties, we must now determine when this statute of limitations began to run on those claims. Under section 515A.4–114, the triggering event for the running of the statute of limitations depends upon whether the warranty breached "explicitly extends to future performance or duration of any improvement or component of the condominium." However, neither the jury instructions nor the special verdict in this case specified precisely which express and implied UCA warranties were breached.[4] Fortunately,

---

**4.** However, the jury instruction covered only section 515A.4–111(1) & (2) and section 515A.4–112(b)(1) & (2). Section 515A.4–111(a)(1) & (2) provides:

(a) Express warranties made by a declarant or an affiliate of a declarant to a purchaser of a unit if reasonably relied upon by the purchaser, are created as follows:

this distinction is not necessary because we find that regardless of the nature of the warranties breached, the Association filed its suit within the six-year statute of limitations.

■ We turn first to warranties *not* falling under part (c) of section 515A.4–114, that is, warranties not "explicitly extending to future performance or duration of any improvement or component of the condominium." Section 515A.4–114(b)(2) provides that if a breach is not of such a warranty and involves a common element such as a roof or exterior wall, a cause of action does not accrue until "the later of (i) the time the common element is completed (ii) the time the first unit in the condominium is conveyed to a bona fide purchaser." *Id.* The court of appeals held that, under this section, the six-year statute of limitations could not begin to run until the declaration for the condominium had been filed. *Hyland Hill,* 538 N.W.2d at 483. Regarding warranties not falling under part (c) of section 515A.4–114, we agree.

Under Minn.Stat. § 515A.2–101(a), a condominium cannot be created until a declaration is filed. *Id.* Also, under Minn.Stat. § 515A.1–103(19), " 'unit' means a portion of the condominium." Thus, the court of appeals concluded that no unit could be conveyed until the declaration was filed. *Hyland Hill,* 538 N.W.2d at 483. Hence, under section 515A.4–114(b)(2), the statute of limitations could not begin to run until the declaration was filed.

(1) any affirmation of fact or promise which relates to the unit, its use, or rights appurtenant thereto, area improvements to the condominium that would directly benefit the unit, or the right to use or have the benefit of facilities not located in the condominium, creates an express warranty that the unit and related rights and uses will conform to the affirmation or promise;
(2) any model or description of the physical characteristics of the condominium, including plans and specifications of or for improvements, creates an express warranty that the condominium will conform to the model or description. A notice prominently displayed on a model or description shall prevent a purchaser from reasonably relying upon the model or description to the extent of the disclaimer set forth on the notice * * *.
Section 515A.4–112(b)(1) & (2) provides:

The Developer, however, points out that the express and implied warranties provided for in the UCA can be created before the creation of the condominium.[5] Thus, it is argued, the statute of limitations should be able to start running before the creation of the condominium. This argument, however, conflates the creation of a warranty with the accrual of a cause of action for breach of that warranty.

We find the court of appeals' conclusion persuasive; it simply makes no sense to say a "unit" has been conveyed before the "unit" exists under the statutory definition. Thus, with respect to common elements, and regarding warranties not covered by section 515A.4–114(c), we hold that the six-year statute of limitations cannot begin to run until the condominium declaration has been filed. Because the declaration was filed in January of 1985, and the present action was commenced in November of 1990, we hold that the Association's claims for breach of warranties under section 515A.4–114(b)(2) are not barred by the six-year statute of limitation.

■ The above reasoning applies if the warranty breached did not "explicitly extend[ ] to future performance or duration of any improvement or component of the condominium." Minn.Stat. § 515A.4–114(c). However, if a warranty does so extend, section 515A.4–114(c) provides that a cause of action accrues upon discovery of the breach rather than the latter of the completion of

(b) A declarant warrants to a purchaser that a unit and the common elements in the condominium are structurally suitable for the ordinary uses of real estate of its type and that any improvements or repairs made or contracted for by the declarant or made by any person in contemplation of the creation of the condominium, will be:
(1) free from defective materials; and
(2) constructed in accordance with applicable law, according to sound engineering and construction standards, and in a workmanlike manner.

5. For example, section 515A.4–111(1) provides that "any affirmation of fact or promise which relates to the unit, its use, or rights appurtenant thereto, * * * creates an express warranty that the unit and related rights and uses *will conform* to the affirmation or promise." *Id.* (emphasis added).

the common element or first conveyance of a unit. *Id.* Still, we see no reason in this case why the Association's discovery of its injury should not be contemporaneous with its discovery of the breach of UCA warranties. Thus, we conclude that the Association discovered the Developer's breach of UCA warranties no later than October 6, 1987. Therefore, whether the warranties breached were those that "extended to future performance or duration of any improvement or component of the condominium" or otherwise, the UCA warranties claims are not barred by the six-year statute of limitations.

■ Finally, the Developer contends that the court of appeals erred in consolidating under the single breach of UCA warranty claim the jury's damages verdict for all the different theories of recovery. In its special verdict, the jury awarded four separate damage figures for the roof: $200,000 for negligence; $100,000 for breach of express warranty under the Uniform Condominium Act; $49,000 for breach of implied warranty under the Uniform Condominium Act; and $1,172 for breach of non-UCA implied warranties. With respect to nonroof defects, the jury awarded: $100,000 for negligence; $1,000 for breach of non-UCA implied warranties; $18,000 for breach of UCA implied warranties; and $19,287 for breach of express UCA warranties. The court of appeals consolidated these awards and deemed them all to be UCA warranty damages. The court stated:

> [W]e have no doubt but that the special verdict form simply left the jury feeling compelled to split up the total damages amongst the three different theories of liability offered.
>
> \*　\*　\*　\*　\*　\*

It is unnecessary for us to speculate as to why the jury allocated damages in the manner it chose because there is no evidence in the record to suggest that liability under the warranty theory should be less in any respect from liability under all theories combined. We hold, therefore, that the damages awarded for a particular

building defect are recoverable in their entirety under breach of warranty. *Hyland Hill,* 538 N.W.2d at 486. Indeed, the total amount of roof-related damages claimed by the Association was $350,172. This is exactly equal to the total amount awarded by the jury for roof defects under the various theories of recovery. The Developer now argues that this consolidation of the special verdict awards by the court of appeals was improper.

We agree. The court of appeals decision implies that the jury intended that the Association be awarded the total amount of damages claimed. However, we are unconcerned with what the jury intended the outcome of the case to be. The intent of the jury does not determine the result in a given case. Rather, it is the application of the law to the facts found by a jury that is controlling. It is, therefore, the factual findings of the jury with which we are concerned.

The facts as found by the jury are neither ambiguous nor inconsistent. For breach of roof-related warranties under the UCA, the jury determined that the Association suffered a total of $149,000 in damages. For breach of nonroof-related warranties under the UCA, the jury determined that the Association suffered a total of $37,287 in damages.[6] As we have held, all the Association's other claims were barred by the two-year statute of limitations under section 541.051. Thus, the damages to which the Association is entitled is the sum of the damages arising from breach of roof and nonroof-related warranties under the UCA together with the $20,010.64 awarded by the district court for breach of fiduciary duties; a total of $206,297.64.

Affirmed in part and reversed in part. Remanded for entry of judgment consistent with this opinion.

---

**6.** These amounts equal the sums of the amounts awarded for breach of both express and implied warranties under the UCA.